[No. F031112. Fifth Dist. May 18, 2000.]

CHARLES H. KELLER et al., Plaintiffs and Respondents, v.
CHOWCHILLA WATER DISTRICT, Defendant and Appellant.

## COUNSEL

Green, Green & Rigby, Denslow Green and Mitchell Rigby for Defendant and Appellant.

Gary W. Sawyers and Melanie J. Aldridge for Friant Water Users Authority as Amicus Curiae on behalf of Defendant and Appellant.

Best, Best & Krieger, Gregory K. Wilkinson, Eric L. Garner and Michelle Ouellette for Association of California Water Agencies as Amicus Curiae on behalf of Defendant and Appellant.

Hatch and Parent and Steven A. Amerikaner for Cities of Alameda, Barstow, Carlsbad, Del Rey Oaks, Marina, Modesto, Plymouth and Vacaville as Amici Curiae on behalf of Defendant and Appellant.

James P. Lough for Plaintiffs and Respondents.

Jonathan M. Coupal; Timothy A. Bittle; and Trevor A. Grimm for Howard Jarvis Taxpayers Association as Amicus Curiae on behalf of Plaintiffs and Respondents.

## Opinion

**THAXTER, J.**—We are here asked to decide whether a preexisting "standby charge" imposed by a water district for the purchase of water is exempted from the assessment procedures of Proposition 218. We conclude that it is.

### Facts and Procedural Background

Respondents (hereinafter the parcel owners) own or lease land within the boundaries of appellant Chowchilla Water District (hereinafter the District). Many of the parcel owners are pistachio growers. The District's boundaries include property in Merced and Madera Counties. The District is a specialized district organized under California law. Pursuant to its general powers, the District may purvey water to landowners and residents of the District.

On November 6, 1996, articles XIII C and XIII D of the California Constitution[1] went into effect after being approved by a vote of the people of the State of California. These amendments to the California Constitution appeared as Proposition 218 on the ballot for the November 5, 1996, General Election and are also known as the Right to Vote on Taxes Act.[2] Generally speaking, Proposition 218 enacted procedures to be followed by a local government wishing to adopt or increase taxes, assessments, fees or

---

[1]Further references to articles are to the California Constitution unless indicated.
[2]The full text of Proposition 218 appears in the appendix to this opinion.

charges.[3] On February 12, 1997, the District approved resolution No. 97-03. This resolution established a standby charge of $52.50 per acre to be levied on all "property capable of receiving water from the District." (*Ibid.*) Thus the standby charge was levied even on property owners who did not and had not used District water. The standby charge established in 1997 was the same as the standby charge for 1996.

Under article XIII D, section 6, subdivision (b)(4), "[s]tandby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed without compliance with Section 4." Section 4 requires, among other things, the sending of a ballot to the owners of the parcels to be assessed, thereby giving the owners an opportunity to vote on whether they want the proposed assessment. (Art. XIII D, § 4.) The District sent no ballots to any parcel owners. Article XIII D, section 5 provides for an exemption from the article XIII D, section 4 procedures for certain assessments already existing on the November 6, 1996, effective date of article XIII D. One of these exemptions is "[a]ny assessment imposed exclusively to finance the capital costs or maintenance and operation expenses for . . . water . . . ." (Art. XIII D, § 5, subd. (a).)

The parcel owners filed a petition for writ of mandate in the superior court. They sought an order commanding the District to cease collecting the 1997 standby charges from District property owners and to return any 1997 standby charge payments made by affected property owners. The parcel owners also sought attorney fees pursuant to Code of Civil Procedure section 1021.5. The trial court rejected the District's contention that article XIII D, section 5 exempted the District from complying with the section 4 procedures and rejected the District's affirmative defense that article XIII D violated the United States Constitution's prohibition against passing any "law impairing the obligation of contracts." (U.S. Const., art. I, § 10, cl. 1.) The court also awarded the parcel owners attorney fees. The District now appeals.

On this appeal the District raises three contentions. It argues: (1) the manner in which the 1997 standby charge was imposed by the District on the parcel owners did not violate the terms of article XIII D; (2) even if the District's imposition of the standby charge did not violate article XIII D, compliance with article XIII D would violate the United States Constitution's article I, section 10, clause 1 prohibition against the impairment of the obligation of contracts; and (3) the court erred in awarding the parcel owners

---

[3]For a summary of the historical background which led to the adoption of Proposition 218, see *Howard Jarvis Taxpayers Assn. v. City of Riverside* (1999) 73 Cal.App.4th 679, 681-683 [86 Cal.Rptr.2d 592]. We need not repeat that summary here.

attorney fees. As we shall explain, we find that the article XIII D, section 5, subdivision (a) exemption applies to the District's standby charge, and that the District therefore did not violate article XIII D. We will reverse the judgment.[4]

## DISCUSSION

### *The Manner in Which the Standby Charge Was Imposed Did Not Violate Article XIII D of the California Constitution*

■ We begin with the well-established rules by which a court will construe the meaning of a provision of the state Constitution. "[It is a] fundamental rule that our primary task is to determine the lawmakers' intent. (*Brown* v. *Kelly Broadcasting Co.* (1989) 48 Cal.3d 711, 724 [257 Cal.Rptr. 708, 771 P.2d 406].) In the case of a constitutional provision adopted by the voters, their intent governs. (*Kaiser* v. *Hopkins* (1936) 6 Cal.2d 537, 538 [58 P.2d 1278]; *Armstrong* v. *County of San Mateo* (1983) 146 Cal.App.3d 597, 618 [194 Cal.Rptr. 294].) To determine intent, ' "The court turns first to the words themselves for the answer." ' (*Brown* v. *Kelly Broadcasting Co.*, *supra*, 48 Cal.3d 711, 724, quoting *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) 'If the language is clear and unambiguous there is no need for construction, nor is it necessary to resort to indicia of the intent of the Legislature (in the case of a statute) or of the voters (in the case of a provision adopted by the voters).' (*Lungren* v. *Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].)" (*Delaney* v. *Superior Court* (1990) 50 Cal.3d 785, 798 [268 Cal.Rptr. 753, 789 P.2d 934]; accord, *People* v. *Jones* (1993) 5 Cal.4th 1142, 1146 [22 Cal.Rptr.2d 753, 857 P.2d 1163].)

Unlike the situation in which the Legislature drafts and then enacts a law, a constitutional provision approved by the voters has not been drafted by those voters (or at least has not been drafted by a statistically significant percentage of them). Thus in interpreting a provision of the Constitution, we look to the ordinary and common meaning of the words used. " 'It must be held that the voters judged of the amendment they were adopting by the

---

[4]Because we conclude the District did not violate article XIII D, we need not and do not reach the District's argument that requiring its standby charge to comply with the article XIII D, section 4 procedures would result in a violation of the United States Constitution's prohibition against the impairment of the obligation of contracts. Also, because there has been no violation of the California Constitution, the parcel owners have not achieved "the enforcement of an important right affecting the public interest." (Code Civ. Proc., § 1021.5.) Since "the enforcement of an important right affecting the public interest" is a prerequisite to an award of attorney fees under Code of Civil Procedure section 1021.5, the award of attorney fees to the parcel owners was erroneous.

meaning apparent on its face according to the general use of the words employed. Such is the rule where it does not appear that the words were used in a technical sense. (*Miller* v. *Dunn* [(1887)] 72 Cal. 462 [14 Pac. 27, 1 Am. St. Rep. 67].) "Where a word having a technical as well as a popular meaning is used in the Constitution, the courts will accord to it its popular signification, unless the very nature of the subject indicates, or the context suggests, that it is used in its technical sense." The words used in a constitution "must be taken in the ordinary and common acceptation, because they are presumed to have been so understood by the framers and by the people who adopted it." (*Miller* v. *Dunn, supra*; *City of Pasadena* v. *Railroad Commission of California* [(1920)] 183 Cal. 526 [192 Pac. 25, 10 A.L.R. 1425]; *San Pedro etc. R. R. Co.* v. *Hamilton* [(1911)] 161 Cal. 610 [119 Pac. 1073, 37 L. R. A. (N. S.) 686]; *Weill* v. *Kenfield* [(1880)] 54 Cal. 111; *Sprague* v. *Norway* [(1866)] 31 Cal. [173].)' " (*Kaiser v. Hopkins* (1936) 6 Cal.2d 537, 538-539 [58 P.2d 1278].)

The parties agree on at least two basic matters. First, the charge imposed by the District on the parcel owners constitutes a standby charge within the meaning of article XIII D. The term "standby charge" is not defined in article XIII D. Nor do the parties point out any statutory or other definition of that term. It does not appear in Black's Law Dictionary (7th ed. 1999) or in Webster's Third New International Dictionary (1986). Amicus curiae Howard Jarvis Taxpayers Association asserts that "standby charges are generally understood to be some sort of property levy, often based on acreage, imposed on the mere *availability* of a service, whether the service is used or not."[5] In the present case the standby charge was levied on all property capable of receiving water from the District, even if the property owners did not use the District's water. Second, article XIII D, section 6, subdivision (b)(4) states in pertinent part: "Standby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed without compliance with Section 4." Section 4 is entitled Procedures and Requirements for All Assessments. It sets forth the procedure to be followed by an agency wishing to levy an assessment on parcels of real property. This procedure includes mailing a ballot to the parcel owners so that each such owner "may indicate . . . his or her support or opposition to the proposed assessment." (Art. XIII D, § 4, subd. (d).)

The parties disagree, however, on whether section 5 of article XIII D exempts the District from having to comply with the section 4 procedures in

[5]The Uniform Standby Charge Procedures Act (Gov. Code, §§ 54984-54984.9), while not defining the term "standby charge," authorizes local agencies to fix such a charge each year for making water available to property "whether the water . . . services are actually used or not." (*Id.* at § 54984.2; see 82 Ops.Cal.Atty.Gen. 35 (1999).)

levying the standby charge. The District contends that language in article XIII D, section 5, subdivision (a) provides such an exemption. In pertinent part, article XIII D states:

"SEC. 5. Effective Date. Pursuant to subdivision (a) of Section 10 of Article II, the provisions of this article shall become effective the day after the election unless otherwise provided. Beginning July 1, 1997, all existing, new, or increased assessments shall comply with this article. Notwithstanding the foregoing, the following assessments existing on the effective date of this article shall be exempt from the procedures and approval process set forth in Section 4:

"(a) *Any assessment imposed exclusively to finance the capital costs or maintenance and operation expenses for* sidewalks, streets, sewers, *water,* flood control, drainage systems or vector control. Subsequent increases in such assessments shall be subject to the procedures and approval process set forth in Section 4." (Italics added.)

We agree with the District's contention that article XIII D, section 5, subdivision (a) exempts the District's standby charge from the article XIII D, section 4 assessment procedures. Our reasoning follows.

First, the parties appear to agree that the standby charge was "existing on the effective date of this article." (Art. XIII D, § 5.)[6] The case thus turns on whether the standby charge was "imposed exclusively to finance the capital costs or maintenance and operation expenses for . . . water . . . ." (Art. XIII D, § 5, subd. (a).) If it was, then it is exempt from the article XIII D, section 4 procedures. If it was not, then the standby charge cannot be levied without compliance with the section 4 procedures.

At trial the parties both argued that the standby charge was imposed for the District's purchase of water. In oral argument before this court, though, the parcel owners asserted that the District did not earmark the standby charge solely for its costs of purchasing water, but simply levied it "to balance its budget." The parcel owners do not, however, claim that the District's other expenditures are not either "capital costs or maintenance and

---

[6]The parcel owners initially argued that the District's standby charge was not an "existing" assessment for purposes of section 5 of article XIII D. Later, however, the parcel owners appear to concede that the standby charge was "existing" for purposes of article XIII D, section 5, subdivision (a). No other party or amicus curiae contends that the standby charge was not "existing" as of November 6, 1996. As we have already pointed out, the 1997 standby charge was the same as the 1996 standby charge. Accordingly we will assume, as all parties and amici curiae do, that the standby charge was "existing" for purposes of article XIII D, section 5, subdivision (a).

operation expenses for . . . water." Thus, if the cost of water purchases comes within those terms, the requirement in article XIII D, section 5, subdivision (a) that the standby charge be "exclusively" for such purposes is satisfied.

The principal disputed inquiry is whether the District's purchase of water falls within the meaning of "capital costs or maintenance and operation expenses for . . . water . . . ." While "water" is not defined, the terms "capital cost" and "maintenance and operation expenses" are defined in section 2 of article XIII D. " 'Capital cost' means the cost of acquisition, installation, construction, reconstruction, or replacement of a permanent public improvement by an agency." (Art. XIII D, § 2, subd. (c).) " 'Maintenance and operation expenses' means the cost of rent, repair, replacement, rehabilitation, fuel, power, electrical current, care, and supervision necessary to properly operate and maintain a permanent public improvement." (*Id.*, subd. (f).) Both definitions refer to "a permanent public improvement." That term, which is not further defined, could not include the liquid we commonly call water. "Permanent" means "continuing or enduring . . . without fundamental or marked change." (Webster's New Internat. Dict., *supra*, at p. 1683.) If the liquid were "permanent," the District would not have to buy more of it every year. "Improvement" means an "addition to or betterment of real property that enhances its capital value . . . and is designed to make the property more useful or valuable." (*Id.* at p. 1138.) The liquid itself is not an "improvement."

If only a permanent public improvement can have a capital cost (art. XIII D, § 2, subd. (c)) or maintenance and operation expenses (*id.*, subd. (f)), and if the liquid we commonly call water is not a permanent public improvement, then how can there be "capital costs or maintenance and operation expenses for . . . water"? (*Id.*, § 5, subd. (a).) There must be something which falls within this category. If there were no such thing as "capital costs or maintenance and operation expenses for . . . water," then the word "water" would not appear in subdivision (a) of section 5, article XIII D. The solution requires harmonizing the article XIII D, section 2, subdivision (c) definition of capital cost and the article XIII D, section 2, subdivision (f) definition of maintenance and operation expenses with the language of article XIII D, section 5, subdivision (a). If the word "water" in article XIII D, section 5, subdivision (a) is construed as referring not to the liquid but to those permanent public improvements reasonably associated with the delivery of water, it acquires meaning.

The California Legislature has taken this view. After Proposition 218 became law, the Legislature enacted the Proposition 218 Omnibus Implementation Act (Gov. Code, §§ 53750-53753.5, added by Stats. 1997, ch. 38,

eff. July 1, 1997) to "clarify the law so that local governments can adopt budgets for the 1997-98 fiscal year to provide essential local services in compliance with Proposition 218 without needless confusion, duplication of effort, and uncertainty." (Stats. 1997, ch. 38, § 10, No. 3 West's Cal. Legis. Service, p. 264.) The act states in pertinent part: "For purposes of . . . Article XIII D of the California Constitution . . . : [¶] . . . [¶] (m) 'Water' means any system of public improvements intended to provide for the production, storage, supply, treatment, or distribution of water." (Gov. Code, § 53750, subd. (m).) In our view, the word "water" in article XIII D, section 5, subdivision (a) has the meaning attributed to it by the Legislature in Government Code section 53750, subdivision (m). Thus things like the District's pipelines and canals are its permanent public improvements.

Having determined what "water" means in article XIII D, section 5, subdivision (a), we turn to the issue of whether the liquid purchased by the District from the federal government falls within the article XIII D, section 2, subdivision (f) definition of "maintenance and operation expenses." In order for the cost of the liquid to fall within the definition, it must be "rent, repair, replacement, rehabilitation, fuel, power, electrical current, care, and supervision necessary to properly operate and maintain" the District's permanent public improvements. The liquid is not rent, repair, rehabilitation, fuel, power, electrical current, care, or supervision. But the cost of the liquid does appear to be a cost of "replacement" necessary to properly operate the District's permanent public improvements.

The word "replacement" appears both in the article XIII D, section 2, subdivision (c) definition of capital cost and in the article XIII D, section 2, subdivision (f) definition of maintenance and operation expenses. The definition of capital costs refers to replacement of the permanent public improvement itself. Thus, the word "replacement" in the article XIII D, section 2, subdivision (f) definition of "maintenance and operation expenses" must refer to something else—the replacement of things (other than the entire permanent public improvement itself) which are necessary to properly operate and maintain the permanent public improvement. The canals and pipelines of a water district cannot "operate" without water in them.

In sum, purchasing the liquid is a cost of replacement necessary to properly operate the structures that comprise the permanent public improvements of the District and is therefore a "maintenance and operation expense." The standby charge was imposed to cover the cost of purchasing the liquid. "Standby charges . . . shall be classified as assessments . . . ." (Art. XIII D, § 6, subd. (b)(4).) The standby charge was therefore an "assessment imposed exclusively to finance the . . . maintenance and operation expenses for . . . water . . ." and was "exempt from the procedures and approval process set forth in Section 4." (*Id.*, § 5.)

Our analysis is consistent with what the voters apparently intended when they approved Proposition 218. The analysis of Proposition 218 by the Legislative Analyst contained in the California ballot pamphlet for the November 5, 1996, General Election described the article XIII D, section 4 procedures pertaining to assessments. It called these "Proposed Requirements for Assessments." After describing these requirements, the analysis stated:

"Figure 1 summarizes the existing assessments that would be exempt from the measure's requirements. We estimate that more than half of all existing assessments would qualify for an exemption. All other existing assessments must meet the measure's requirements—including the voter approval requirement—by July 1, 1997.

"**Figure 1**

"**Existing Assessments Exempt from the Measure's Requirements**

"• Assessments previously approved by voters—or by all property owners at the time the assessment was created.

"• Assessments where all the funds are used to repay bond obligations.

"• *Assessments where all the funds are used to pay for* sidewalks, streets, sewers, *water*, flood control, drainage systems or, 'vector control' (such as mosquito control)." (Ballot Pamp., Gen. Elec. (Nov. 5, 1996) analysis of Prop. 218 by Legis. Analyst, p. 74, italics added (hereafter Pamphlet).)

The analysis by the Legislative Analyst also stated "The measure treats standby charges as assessments." (Pamphlet, *supra*, at p. 73.) The electorate thus presumably viewed an existing standby charge "where all the funds are used to pay for . . . water" to be exempt from the article XIII D, section 4 "requirements" (assessment procedures). That is precisely what we have here.

Two further issues require brief discussion. The first involves an additional interpretation of Proposition 218 offered by the parcel owners at oral argument in this court. They had not previously articulated that interpretation either in the trial court or in their appellate briefs. According to the parcel owners, article XIII D, section 4 sets certain substantive standards for assessments, in subdivisions (a) and (b), as well as specifying various procedures which must be followed, in subdivision (c) et seq. Article XIII D,

section 5 exempts existing assessments only from "the procedures and approval process set forth in Section 4." Thus, argue the parcel owners, subdivisions (a) and (b) remain applicable even as to existing assessments.

We reject the argument. Article XIII D, section 4 is entitled Procedures and Requirements for All Assessments. Subdivision (a) requires an agency to identify parcels specially benefited by a proposed assessment and to determine the special benefit flowing to each identified parcel. Subdivision (b) requires preparation of a detailed engineer's report to support the proposed assessment. Each of these requirements involves a procedure and comes within the exemption of "procedures" in article XIII D, section 5. Subdivisions (c), (d), and (e) deal with written notice to the parcel owners, the submission of ballots, and the conduct of a public hearing on the proposal. These requirements fall within the exemption of "approval process" in section 5 of article XIII D.

If the intent of the article XIII D, section 5 exemption were to relieve an agency from complying with only some of the requirements of article XIII D, section 4, we assume the drafters would have referred to those requirements with specificity. They did not. We therefore reject the strained construction propounded by the parcel owners.

Finally, amicus curiae Howard Jarvis Taxpayers Association (HJTA) raises an argument different from those of the parties and of the other amici curiae. HJTA argues that section 6, subdivision (b)(4) of article XIII D not only classifies standby charges as assessments for purposes of Proposition 218, but also makes standby charges a unique type of assessment—an assessment to which none of the exemptions of article XIII D, section 5 may apply. Article XIII D, section 6, subdivision (b)(4) states in pertinent part: "Standby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed without compliance with Section 4." We disagree with HJTA.

Section 4 of article XIII D sets forth the procedures applicable to assessments. Section 5 lists the specific categories of assessments that are "exempt from the procedures and approval process set forth in Section 4." (Art. XIII D, § 5.) Section 6 of article XIII D describes the procedures applicable to property-related fees and charges. Fees and charges are defined in article XIII D, section 2, subdivision (e) and are different from assessments, which are defined in section 2, subdivision (b). The last sentence of article XIII D, section 6, subdivision (b)(4) makes clear that the procedures applicable to standby charges are the procedures applicable to assessments (the § 4 procedures), and not the procedures applicable to fees and charges. There is no

hint anywhere in Proposition 218 that standby charges are to be treated differently from any other type of assessment. HJTA asks us to read article XIII D, section 6, subdivision (b)(4) as if it said "Standby charges, whether characterized as charges or assessments, shall be classified as assessments for purposes of this article, except that they shall not be classified as assessments for purposes of Section 5 of this article." Absent any clearly expressed exception to article XIII D, section 6, subdivision (b)(4)'s statement that "[s]tandby charges . . . shall be classified as assessments," we think the electorate understood Proposition 218 as requiring standby charges to be treated like assessments and subject to all of the provisions of Proposition 218 pertaining to assessments, including section 5 of article XIII D.[7]

### DISPOSITION

The judgment is reversed with directions to deny the petition for writ of mandate. Costs are awarded to appellant.

Dibiaso, Acting P. J., and Buckley, J., concurred.

A petition for a rehearing was denied June 15, 2000, and respondents' petition for review by the Supreme Court was denied August 23, 2000.

---

[7]Again, any voter who read the analysis by the Legislative Analyst read: "The measure treats standby charges as assessments." (Pamphlet, *supra*, at p. 73.)

APPENDIX

## Proposition 218: Text of Proposed Law[8]

This initiative measure is submitted to the people in accordance with the provisions of Article II, Section 8 of the Constitution.

This initiative measure expressly amends the Constitution by adding articles thereto; therefore, new provisions proposed to be added are printed in *italic type* to indicate that they are new.

PROPOSED ADDITION OF ARTICLE XIII C AND ARTICLE XIII D

RIGHT TO VOTE ON TAXES ACT

SECTION 1. TITLE. This act shall be known and may be cited as the "Right to Vote on Taxes Act."

SECTION 2. FINDINGS AND DECLARATIONS. The people of the State of California hereby find and declare that Proposition 13 was intended to provide effective tax relief and to require voter approval of tax increases. However, local governments have subjected taxpayers to excessive tax, assessment, fee and charge increases that not only frustrate the purposes of voter approval for tax increases, but also threaten the economic security of all Californians and the California economy itself. This measure protects taxpayers by limiting the methods by which local governments exact revenue from taxpayers without their consent.

SECTION 3. VOTER APPROVAL FOR LOCAL TAX LEVIES.

Article XIII C is added to the California Constitution to read:

### *ARTICLE XIII C*

*SECTION 1. Definitions. As used in this article:*

*(a) "General tax" means any tax imposed for general governmental purposes.*

*(b) "Local government" means any county, city, city and county, including a charter city or county, any special district, or any other local or regional governmental entity.*

*(c) "Special district" means an agency of the state, formed pursuant to general law or a special act, for the local performance of governmental or proprietary functions with limited geographic boundaries including, but not limited to, school districts and redevelopment agencies.*

*(d) "Special tax" means any tax imposed for specific purposes, including a tax imposed for specific purposes, which is placed into a general fund.*

*SEC. 2. Local Government Tax Limitation. Notwithstanding any other provision of this Constitution:*

*(a) All taxes imposed by any local government shall be deemed to be either general taxes or special taxes. Special purpose districts or agencies, including school districts, shall have no power to levy general taxes.*

*(b) No local government may impose, extend, or increase any general tax unless and until that tax is submitted to the electorate and approved by a majority vote. A general tax shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved. The election required by this subdivision shall be consolidated with a regularly scheduled general election for members of the governing body of the local government, except in cases of emergency declared by a unanimous vote of the governing body.*

*(c) Any general tax imposed, extended, or increased, without voter approval, by any local government on or after January 1, 1995, and prior to the effective date of this article, shall continue to be imposed only if approved by a majority vote of the voters voting in an election on the issue of the imposition, which election shall be held within two years of the effective date of this article and in compliance with subdivision (b).*

*(d) No local government may impose, extend, or increase any special tax unless and until that tax is submitted to the electorate and approved by a two-thirds vote. A special tax*

---

[8]Ballot Pamphlet, General Election (Nov. 5, 1996) text of Proposition 218, pages 108-109.

shall not be deemed to have been increased if it is imposed at a rate not higher than the maximum rate so approved.

SEC. 3. Initiative Power for Local Taxes, Assessments, Fees and Charges. Notwithstanding any other provision of this Constitution, including, but not limited to, Sections 8 and 9 of Article II, the initiative power shall not be prohibited or otherwise limited in matters of reducing or repealing any local tax, assessment, fee or charge. The power of initiative to affect local taxes, assessments, fees and charges shall be applicable to all local governments and neither the Legislature nor any local government charter shall impose a signature requirement higher than that applicable to statewide statutory initiatives.

## SECTION 4. ASSESSMENT AND PROPERTY RELATED FEE REFORM.

Article XIII D is added to the California Constitution to read:

### ARTICLE XIII D

SECTION 1. Application. Notwithstanding any other provision of law, the provisions of this article shall apply to all assessments, fees and charges, whether imposed pursuant to state statute or local government charter authority. Nothing in this article or Article XIII C shall be construed to:

(a) Provide any new authority to any agency to impose a tax, assessment, fee, or charge.

(b) Affect existing laws relating to the imposition of fees or charges as a condition of property development.

(c) Affect existing laws relating to the imposition of timber yield taxes.

SEC. 2. Definitions. As used in this article:

(a) "Agency" means any local government as defined in subdivision (b) of Section 1 of Article XIII C.

(b) "Assessment" means any levy or charge upon real property by an agency for a special benefit conferred upon the real property. "Assessment" includes, but is not limited to, "special assessment," "benefit assessment," "maintenance assessment" and "special assessment tax."

(c) "Capital cost" means the cost of acquisition, installation, construction, reconstruction, or replacement of a permanent public improvement by an agency.

(d) "District" means an area determined by an agency to contain all parcels which will receive a special benefit from a proposed public improvement or property-related service.

(e) "Fee" or "charge" means any levy other than an ad valorem tax, a special tax, or an assessment, imposed by an agency upon a parcel or upon a person as an incident of property ownership, including a user fee or charge for a property related service.

(f) "Maintenance and operation expenses" means the cost of rent, repair, replacement, rehabilitation, fuel, power, electrical current, care, and supervision necessary to properly operate and maintain a permanent public improvement.

(g) "Property ownership" shall be deemed to include tenancies of real property where tenants are directly liable to pay the assessment, fee, or charge in question.

(h) "Property-related service" means a public service having a direct relationship to property ownership.

(i) "Special benefit" means a particular and distinct benefit over and above general benefits conferred on real property located in the district or to the public at large. General enhancement of property value does not constitute "special benefit."

SEC. 3. Property Taxes, Assessments, Fees and Charges Limited. (a) No tax, assessment, fee, or charge shall be assessed by any agency upon any parcel of property or upon any person as an incident of property ownership except:

(1) The ad valorem property tax imposed pursuant to Article XIII and Article XIII A.

(2) Any special tax receiving a two-thirds vote pursuant to Section 4 of Article XIII A.

(3) Assessments as provided by this article.

(4) Fees or charges for property related services as provided by this article.

(b) For purposes of this article, fees for the provision of electrical or gas service shall not be deemed charges or fees imposed as an incident of property ownership.

SEC. 4. Procedures and Requirements for All Assessments. (a) An agency which proposes to levy an assessment shall identify all parcels which will have a special benefit conferred upon them and upon which an assessment will be imposed. The proportionate special benefit derived by each identified parcel shall be determined in relationship to the entirety of the capital cost of a public improvement, the maintenance and operation expenses of a public improvement, or the cost of

the property related service being provided. No assessment shall be imposed on any parcel which exceeds the reasonable cost of the proportional special benefit conferred on that parcel. Only special benefits are assessable, and an agency shall separate the general benefits from the special benefits conferred on a parcel. Parcels within a district that are owned or used by any agency, the State of California or the United States shall not be exempt from assessment unless the agency can demonstrate by clear and convincing evidence that those publicly owned parcels in fact receive no special benefit.

(b) All assessments shall be supported by a detailed engineer's report prepared by a registered professional engineer certified by the State of California.

(c) The amount of the proposed assessment for each identified parcel shall be calculated and the record owner of each parcel shall be given written notice by mail of the proposed assessment, the total amount thereof chargeable to the entire district, the amount chargeable to the owner's particular parcel, the duration of the payments, the reason for the assessment and the basis upon which the amount of the proposed assessment was calculated, together with the date, time, and location of a public hearing on the proposed assessment. Each notice shall also include, in a conspicuous place thereon, a summary of the procedures applicable to the completion, return, and tabulation of the ballots required pursuant to subdivision (d), including a disclosure statement that the existence of a majority protest, as defined in subdivision (e), will result in the assessment not being imposed.

(d) Each notice mailed to owners of identified parcels within the district pursuant to subdivision (c) shall contain a ballot which includes the agency's address for receipt of the ballot once completed by any owner receiving the notice whereby the owner may indicate his or her name, reasonable identification of the parcel, and his or her support or opposition to the proposed assessment.

(e) The agency shall conduct a public hearing upon the proposed assessment not less than 45 days after mailing the notice of the proposed assessment to record owners of each identified parcel. At the public hearing, the agency shall consider all protests against the proposed assessment and tabulate the ballots. The agency shall not impose an assessment if there is a majority protest. A majority protest exists if, upon the conclusion of the hearing, ballots submitted in opposition to the assessment exceed the ballots submitted in favor of the assessment. In tabulating the ballots, the ballots shall be weighted according to the proportional financial obligation of the affected property.

(f) In any legal action contesting the validity of any assessment, the burden shall be on the agency to demonstrate that the property or properties in question receive a special benefit over and above the benefits conferred on the public at large and that the amount of any contested assessment is proportional to, and no greater than, the benefits conferred on the property or properties in question.

(g) Because only special benefits are assessable, electors residing within the district who do not own property within the district shall not be deemed under this Constitution to have been deprived of the right to vote for any assessment. If a court determines that the Constitution of the United States or other federal law requires otherwise, the assessment shall not be imposed unless approved by a two-thirds vote of the electorate in the district in addition to being approved by the property owners as required by subdivision (e).

SEC. 5. Effective Date. Pursuant to subdivision (a) of Section 10 of Article II, the provisions of this article shall become effective the day after the election unless otherwise provided. Beginning July 1, 1997, all existing, new, or increased assessments shall comply with this article. Notwithstanding the foregoing, the following assessments existing on the effective date of this article shall be exempt from the procedures and approval process set forth in Section 4:

(a) Any assessment imposed exclusively to finance the capital costs or maintenance and operation expenses for sidewalks, streets, sewers, water, flood control, drainage systems or vector control. Subsequent increases in such assessments shall be subject to the procedures and approval process set forth in Section 4.

(b) Any assessment imposed pursuant to a petition signed by the persons owning all of the parcels subject to the assessment at the time the assessment is initially imposed. Subsequent increases in such assessments shall be

subject to the procedures and approval process set forth in Section 4.

(c) Any assessment the proceeds of which are exclusively used to repay bonded indebtedness of which the failure to pay would violate the Contract Impairment Clause of the Constitution of the United States.

(d) Any assessment which previously received majority voter approval from the voters voting in an election on the issue of the assessment. Subsequent increases in those assessments shall be subject to the procedures and approval process set forth in Section 4.

SEC. 6. Property Related Fees and Charges. (a) Procedures for New or Increased Fees and Charges. An agency shall follow the procedures pursuant to this section in imposing or increasing any fee or charge as defined pursuant to this article, including, but not limited to, the following:

(1) The parcels upon which a fee or charge is proposed for imposition shall be identified. The amount of the fee or charge proposed to be imposed upon each parcel shall be calculated. The agency shall provide written notice by mail of the proposed fee or charge to the record owner of each identified parcel upon which the fee or charge is proposed for imposition, the amount of the fee or charge proposed to be imposed upon each, the basis upon which the amount of the proposed fee or charge was calculated, the reason for the fee or charge, together with the date, time, and location of a public hearing on the proposed fee or charge.

(2) The agency shall conduct a public hearing upon the proposed fee or charge not less than 45 days after mailing the notice of the proposed fee or charge to the record owners of each identified parcel upon which the fee or charge is proposed for imposition. At the public hearing, the agency shall consider all protests against the proposed fee or charge. If written protests against the proposed fee or charge are presented by a majority of owners of the identified parcels, the agency shall not impose the fee or charge.

(b) Requirements for Existing, New or Increased Fees and Charges. A fee or charge shall not be extended, imposed, or increased by any agency unless it meets all of the following requirements:

(1) Revenues derived from the fee or charge shall not exceed the funds required to provide the property related service.

(2) Revenues derived from the fee or charge shall not be used for any purpose other than that for which the fee or charge was imposed.

(3) The amount of a fee or charge imposed upon any parcel or person as an incident of property ownership shall not exceed the proportional cost of the service attributable to the parcel.

(4) No fee or charge may be imposed for a service unless that service is actually used by, or immediately available to, the owner of the property in question. Fees or charges based on potential or future use of a service are not permitted. Standby charges, whether characterized as charges or assessments, shall be classified as assessments and shall not be imposed without compliance with Section 4.

(5) No fee or charge may be imposed for general governmental services including, but not limited to, police, fire, ambulance or library services, where the service is available to the public at large in substantially the same manner as it is to property owners. Reliance by an agency on any parcel map, including, but not limited to, an assessor's parcel map, may be considered a significant factor in determining whether a fee or charge is imposed as an incident of property ownership for purposes of this article. In any legal action contesting the validity of a fee or charge, the burden shall be on the agency to demonstrate compliance with this article.

(c) Voter Approval for New or Increased Fees and Charges. Except for fees or charges for sewer, water, and refuse collection services, no property related fee or charge shall be imposed or increased unless and until that fee or charge is submitted and approved by a majority vote of the property owners of the property subject to the fee or charge or, at the option of the agency, by a two-thirds vote of the electorate residing in the affected area. The election shall be conducted not less than 45 days after the public hearing. An agency may adopt procedures similar to those for increases in assessments in the conduct of elections under this subdivision.

(d) Beginning July 1, 1997, all fees or charges shall comply with this section.

SECTION 5. LIBERAL CONSTRUC-TION. The provisions of this act shall be liberally construed to effectuate its purposes of limiting local government revenue and enhancing taxpayer consent.

SECTION 6. SEVERABILITY. If any provision of this act, or part thereof, is for any reason held to be invalid or unconstitutional, the remaining sections shall not be affected, but shall remain in full force and effect, and to this end the provisions of this act are severable.